```
               UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
               Case No. 11-60047-Cr-UNGARO
```

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
         -v-                   )
                               )
BRANDI JOHNSON,                )
                               ) Miami, Florida
              Defendant.       ) September 30, 2011
                               ) 1:35 p.m.


                    Pages 1-25

           TRANSCRIPT OF SENTENCING PROCEEDINGS

            BEFORE THE HONORABLE URSULA UNGARO

                 U.S. DISTRICT JUDGE


APPEARANCES:

For the Government        MARC S. ANTON
                          Assistant U.S. Attorney
                          500 East Broward Blvd. - 7th Floor
                          Fort Lauderdale, Florida  33301-3002


For the Defendant         JOAQUIN E. PADILLA
                          Assistant Federal Public Defender
                          150 West Flagler Street
                          Miami, Florida  33130


REPORTED BY:              WILLIAM G. ROMANISHIN, RMR, FCRR, CRR
(305) 523-5558            Official Court Reporter
                          400 North Miami Avenue
                          Miami, Florida  33128


        STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1          (Call to order of the Court)

2          THE COURT:  Okay.  The case before the Court is the

3   United States versus Brandi Johnson, case number 11-60047.

4          Who's here for the United States?

5          MR. ANTON:  Good afternoon, Your Honor.  Marc Anton

6   on behalf of the United States.

7          THE COURT:  Okay.  And who's here for Ms. Johnson?

8          MR. PADILLA:  Good afternoon, Judge.  Joaquin Padilla

9   from the Federal Defender's office on behalf of Ms. Johnson,

10  who's present here in court.

11         THE COURT:  Okay.  And who's here from Probation?

12         THE PROBATION OFFICER:  Good afternoon, Your Honor.

13  Lucrecia Peralta, U.S. Probation.

14         THE COURT:  You can have a seat.

15         So, according to Probation, the total offense level

16  in the case is a 26, criminal history category of six.

17         Now, there were objections filed.  Could you just

18  briefly summarize them, Mr. Padilla?

19         MR. PADILLA:  Yes, Judge.  Good afternoon.

20         Judge, I have two objections that I filed, and those

21  objections are, number one, to the loss amount, and number

22  two, to her role in the offense.

23         THE COURT:  You know, I know you were sitting here

24  earlier and I know everyone is entitled to an individual

25  sentencing.  But, you know, in terms of loss amount, really,

1  what is the issue, Mr. Padilla?

2          MR. PADILLA:  Judge, you're correct, I was able to

3  sit through a good portion of the testimony this morning in

4  terms of Ms. Rembert.

5          Let me maybe shift a little bit different.  Let me

6  shift the focus a little bit.

7          The Government's argument for loss in this case as it

8  relates to Ms. Johnson stems from her role as a manager/

9  supervisor.  In their objections, this is what the Government

10  said:  As a supervisor/manager, Brandi Johnson was responsible

11  for the losses of her subordinates and should be held

12  responsible for the losses of, and then it goes into

13  Ms. Sermons, Ms. Powell and Ms. Blasingame.

14          My argument really goes to Ms. Johnson's role in this

15  case.

16          THE COURT:  So the issue is not really -- well, I

17  don't get it.  First of all, I could see how you could have an

18  argument as to role, but I don't see how you could have an

19  argument as to loss.

20          MR. PADILLA:  The argument that I have to loss,

21  Judge, goes --

22          THE COURT:  She didn't know Ms. Blasingame; she

23  didn't know Minnie Powell; she didn't know Ms. Sermons?

24          MR. PADILLA:  No, I'm not saying that at all, Judge.

25  What I'm saying, simply, is that, especially as it relates

1   to -- I just misplaced my notes -- as it relates to

2   Ms. Sermons -- let me back up.

3            There's no about of what Brandi did.  What Brandi did

4   was make phone calls on behalf of Demarcus Hough in this

5   case.  That's what happened.  She made phone calls and she

6   added users to credit card accounts.  That's what she did in

7   this case.

8            One of the things that come out in the PSI that I

9   have not seen contradicted at any point is that Ms. Sermons

10  stated in her pleadings that she received direction from

11  Demarcus and those losses were directly related to Demarcus

12  Hough.

13           So, in terms of a large portion of the loss in this

14  case, what I'm saying is that Ms. Johnson was not directing

15  Ms. Sermons and Ms. Sermons was not a subordinate of

16  Ms. Johnson.

17           THE COURT:  Well, regardless of whether or not she

18  was a subordinate, right, because these are really two

19  separate issues, right --

20           MR. PADILLA:  Correct.

21           THE COURT:   -- does she deny that the credit card

22  numbers that were used -- I'm sorry, who was it, Ms. Sermons?

23           MR. PADILLA:  Correct.

24           THE COURT:  Does she deny any role in connection with

25  providing her -- Ms. Sermons -- with either the credit card

1   numbers or the credit cards or anything else that Ms. Sermons

2   used in order to conduct the fraudulent transactions?

3           MR. PADILLA:  No.

4           THE COURT:  Well, then, I don't see where the

5   argument is.

6           MR. PADILLA:  The argument is that in Ms. Sermons'

7   statement, that she was directed by Demarcus Hough.

8           THE COURT:  I'm not talking about role.

9           MR. PADILLA:  Okay.

10          THE COURT:  I'm talking about loss amount.

11          MR. PADILLA:  All right.

12          THE COURT:  So I don't see where the argument is as

13  to the loss amount.

14          MR. PADILLA:  That's fine, Judge.  Then I'll reserve

15  my argument for role.

16          THE COURT:  Okay.  So, does that mean you're

17  withdrawing your argument as to loss amount and we're going to

18  talk about role?

19          MR. PADILLA:  Yes.

20          THE COURT:  All right.  And is your issue as to role

21  solely related to Ms. Sermons?

22          MR. PADILLA:  No.  I believe role is directly related

23  to the entire case.

24          THE COURT:  Okay.  I just wanted clarification on

25  that, because it just sounded as though you were limiting it

1    to Ms. Sermons.

2          MR. PADILLA:  I think that's evidence of her role in

3    the case.

4          THE COURT:  Okay.  All right.  Well, are you ready to

5    proceed, Mr. Anton?  I cannot spend hours on this.

6          MR. PADILLA:  I don't think that we anticipate

7    spending hours on this.  I think that perhaps Mr. Anton can

8    provide a proffer and we can make argument and that's it.

9          THE COURT:  I don't know whether that's the case or

10   not.  But go ahead and try.  We can always put the agent on

11   the stand.

12         MR. ANTON:  Judge, by way of proffer, Brandi Johnson

13   essentially is right in the middle and essentially is the

14   organizer/leader of her side of the conspiracy.  She was

15   obtaining personal identifying information, whether directly

16   from Jasmin Rembert or not, certainly through Demarcus Hough.

17         That information was then utilized at her direction

18   when she called specifically the credit card companies and

19   added numerous authorized users.  That would have been Eloise

20   Sermons, Minnie Powell and Latia Blasingame.

21         Statements obtained from those individuals indicate

22   that it was Brandi Johnson who was driving the vehicles on

23   multiple occasions when these fraudulent transactions were

24   taking place.

25         Specifically, there is the statement from Minnie

1  Powell -- and I will combine it with Latia Blasingame -- they

2  both admitted that it was Brandi Johnson who had picked them

3  up and had driven them to the various local merchants to pick

4  out the merchandise that Johnson wanted, and then it was

5  Powell and Blasingame who used the credit cards to pay at

6  Brandi's request.

7       A review of their statement indicates that both of

8  them admitted that they drove them to the banks and that each

9  time it was Brandi Johnson who directed them as to the

10  specific amounts for the cash advances and what should be done

11  once inside the bank.

12       So she's certainly directing Minnie Powell and Latia

13  Blasingame.  She might not have driven Minnie Powell -- Minnie

14  Powell's capacity to understand and speak, obviously, is

15  severely limited from Your Honor's findings -- but

16  nonetheless, she was at the helm.  She knew which names to put

17  on.  She called the credit card companies, put those people's

18  names on, acted as an intermediary between Jasmin Rembert and

19  Demarcus Hough, and was right in the center and facilitated

20  the entire loss as it relates to her side of the

21  organization.

22       THE COURT:  But why is she an organizer and a leader

23  as opposed to a manager or supervisor?

24       MR. ANTON:  Judge, I think it was manager/supervisor

25  because of the number of people that were involved.  I mean,

1   whether you classify her as --

2        THE COURT:  Well, organizer/leader is four levels.

3   Manager/supervisor is three levels, provided there are five or

4   more people involved, and two levels, it's organizer, leader,

5   manager or supervisor.

6        MR. ANTON:  Judge, I think her role is probably most

7   consistent with being a manager/supervisor of her particular

8   group.  I mean, in terms of who is the true leader, you really

9   have Courtney Gissendanner on one side and his cell --

10       THE COURT:  So you would agree it should be three

11  levels, not four.

12       MR. ANTON:  I wouldn't object to Your Honor imposing

13  a three-level versus a four.  But I do think she definitely

14  supervised her group because everything filtered directly --

15       THE COURT:  Who brought these individuals into the

16  group?

17       MR. ANTON:  Judge, I believe she brought in Latia

18  Blasingame and Minnie Powell, and I do believe it was Demarcus

19  Hough who brought in Eloise Sermons.

20       THE COURT:  Okay.  And as I recall, part of the

21  defense argument is that she was only involved in the offense

22  for a short period of time.  What do you say to that?

23       MR. ANTON:  Only because she was in prison, Judge.  I

24  don't mean to, you know, dismiss that.  But a review of her

25  record indicates lengthy prison terms.  Her entire criminal

1  history is fraudulent conduct.  She committed the instant

2  offense while on probation for bank fraud.  So, yes, she was

3  only involved with it for a short period of time.

4        THE COURT:  Well, when you say "a short period of

5  time," when was she involved in it?  How many months?  Long

6  enough to rack up $408,000 in losses.

7        MR. ANTON:  Yes, Judge, that's correct.

8        THE COURT:  The amount of time that Ms. Rembert was

9  involved.

10        MR. ANTON:  That's correct, Judge, for sure.

11        THE COURT:  So about eight months.  Is that what it

12  is?

13        MR. ANTON:  That's a conservative number.  But, yes.

14        THE COURT:  Why is that a conservative number?

15        MR. ANTON:  Judge, certainly it's possible -- I mean,

16  she has known Demarcus Hough for a long time.  So they

17  certainly had interactions with them.

18        In terms of this particular scheme, in terms of the

19  credit cards, I wouldn't disagree with you that it could have

20  been eight months.

21        THE COURT:  Well, when did she get out of prison?

22        MR. ANTON:  She was released on February of 2010 from

23  her most recent incarceration.

24        If you're asking me if she began in December of 2008,

25  like the beginning of the indictment states, I would say no.

1    She definitely was after the fact.

2          But remember, the conspiracy was really a multi-

3    facetted dual-prong conspiracy.

4          THE COURT:  Right.  So when did it come to an end?

5          MR. ANTON:  It came to an end when she was arrested.

6          THE COURT:  Which is when, Mr. Anton?

7          MR. ANTON:  The date of her arrest was -- I can pull

8    the PSI -- April 4, 2011.

9          THE COURT:  Okay.  So she got out of prison when?

10   September.

11         MR. ANTON:  February 7, 2010.

12         THE COURT:  February 7, 2010.

13         And she was arrested in April.  Is that what you just

14   said?

15         MR. ANTON:  So 14 months.

16         THE COURT:  Okay.  What do you want to say,

17   Mr. Padilla?

18         MR. PADILLA:  Judge, this is a multilayered case, and

19   part of my objections and part of what I was trying to address

20   in this case is trying to determine her appropriate role given

21   what happened collectively in this case.

22         Yes, she was in jail and she was released in

23   February.  She admitted to the police when she was arrested

24   that she got involved in this case in October.  The PSI

25   reflects that she got involved in this case in October.  Now

1  the Government is saying, well, she could have been involved

2  since her release in February.

3          Well, where is the evidence?  The facts are as we

4  know them.  Respectfully, I think that we ought to stick to

5  the facts that we have available us.  I have a hard time

6  understanding -- here we are at the sentencing date and

7  Mr. Anton is now saying, well, it's possible that she got

8  involved right after her release.

9          THE COURT:  I don't know why you should find that

10  that amazing when you handed me a psychological evaluation

11  about a half hour before the sentencing began.

12          But putting that aside --

13          MR. PADILLA:  That has nothing to do with the facts

14  of the case.

15          THE COURT:  Putting that aside --

16          MR. PADILLA:  It has nothing to do with the facts.

17          THE COURT:  -- let's talk about the fact that somehow

18  these women managed to rack up $408,000 in losses in a short

19  period of time.

20          She's not being held responsible for anything other

21  than the losses attributable to her group.  She is not being

22  held responsible from a loss standpoint to anything that

23  anybody did outside of her group.

24          So why isn't she a manager/supervisor with respect to

25  her group, which appears to have basically consisted of

1   herself, Demarcus Hough, Minnie Powell, Eloise Sermons and

2   Ms. Blasingame and somebody else, right, who was indicted in

3   some other case?  Is that right?

4          MR. ANTON:  Yes, Judge.

5          MR. PADILLA:  To use the Government's own word, they

6   described her as an intermediary.  That's what they just

7   said.  And that's what happened.  She was directed in this

8   case by Demarcus Hough.  There's no doubt about that.

9          You know, reading the PSI in the case, I had a --

10         THE COURT:  Bell, does Demarcus Hough drive these

11  people around also?

12         MR. PADILLA:  I don't know what that has to do with

13  directing them to do anything with credit cards.

14         THE COURT:  Well, we're talking about managing and

15  supervising these people.  Did Demarcus Hough drive Minnie

16  Powell around?

17         MR. PADILLA:  I have no idea.

18         THE COURT:  Did he drive Eloise Sermons around?

19         MR. PADILLA:  I have no idea.

20         THE COURT:  Did he drive Ms. Blasingame around?

21         MR. PADILLA:  I don't know.

22         THE COURT:  Did he tell them what to buy?

23         MR. PADILLA:  I think maybe in some cases he did.

24         THE COURT:  But you don't know.  You're speculating.

25         MR. PADILLA:  I have no idea.  I know what my client

1    did, and what I'm saying is that when you look at the facts in

2    this case, and if you read the PSI objectively, without going

3    to the headlines that were put in there by Probation, you can

4    see that there were two leaders in this case, and that's

5    Demarcus Hough and that's Courtney Gissendanner.  There's no

6    doubt about that.

7         If you're Demarcus Hough, are you going to drive

8    somebody to the bank to pull out money?  Are you going to make

9    phone calls by yourself?

10        THE COURT:  There's nothing about 3B1.1 that says

11   there can't be somebody over your client and her still be

12   classified as a supervisor or manager.

13        MR. PADILLA:  I don't think she should have a four-

14   level increase.

15        THE COURT:  I agree.  I think it should be a three-

16   level increase.

17        MR. PADILLA:  All right.  What I'm saying to you,

18   then, is I don't think that she should be at the same level --

19   if we can agree on the fact that there were people above her,

20   then I think that you have to also recognize that Demarcus

21   Hough --

22        THE COURT:  Well, that's not the basis for my

23   conclusion.  The basis for my conclusion would be based on the

24   description of the conduct that Mr. Anton provided, the nature

25   of the conduct is more consistent with having been a manager

1   or a supervisor rather than an organizer/leader.

2          MR. PADILLA:  Respectfully, what I'm saying to you,

3   Judge, is that in this case Demarcus Hough was given a

4   three-level increase for his role in the case.  If we can

5   agree that Demarcus Hough and Courtney Gissendanner were

6   probably the two leaders in this case, I don't know how you

7   can then say that Ms. Johnson is also a level three role

8   enhancement.  Could she be a two?  Perhaps.  Maybe we can

9   concede that she is a two.  But I don't know how you fit her

10  conduct in and it's equal to what those two individuals did in

11  this case, respectfully.

12         MR. ANTON:  Judge, maybe I can answer that.  Briefly,

13  you gave a three-level increase to Rufus Bethea, and his role

14  was organizing -- or managing and supervising the subordinate

15  shoppers under his little prong that was -- I could pull it

16  up, the specific defendants.  But he was the same thing.  He

17  was essentially the male version of Brandi Johnson supervising

18  the shoppers.

19         Were there others on top?  Yes, there were.  But you

20  have imposed additional three-level enhancements for others

21  within the organization consistent with what her role is here

22  today.

23         THE COURT:  Okay.  Look, it may be that Demarcus

24  Hough was more involved than she was, and it may be that

25  Demarcus Hough got a three-level enhancement.  But that does

1  not mean a three-level enhancement is not appropriate for

2  Ms. Johnson.

3           Based on what I have heard about the nature of the

4  conduct, which appears not to be disputed -- the only thing

5  that's disputed is how the Court should view it as a legal

6  matter -- but based on what has been relayed here, it seems to

7  me to be appropriate that Ms. Johnson be enhanced three points

8  as a manager and supervisor.

9           So that changes the guidelines to -- that brings her

10 down to a total offense level of 25, criminal history category

11 six.

12          So, what's the guideline range?

13          THE PROBATION OFFICER:  Your Honor, the guideline

14 range should now be 110 to 137 months.

15          THE COURT:  Okay.  Now, of course, Ms. Johnson has a

16 horrible criminal history, especially for a case like this:

17 Grand theft, uttering forged instrument, grand theft,

18 burglary, bank fraud.  She was on Probation for bank fraud

19 when she committed this offense.

20          So, what does the Government think the appropriate

21 sentence should be?

22          MR. ANTON:  Judge, the Government feels that a

23 guideline sentence certainly is appropriate in this case.  As

24 you mentioned, she has a lengthy criminal history all

25 involving fraud.  She was on probation for a bank fraud at the

time of this instant offense.  Her role was a $407,000 loss.

It was a very serious role.  Clearly, Judge, 110 months or

more is certainly appropriate in this case.  I would ask that

Your Honor not depart downward or not vary downward.  Her

criminal history is essentially off the top of the charts for

the exact same criminal conduct for which she's here before

the Court.

THE COURT:  Okay.  What do you want to say,

Mr. Padilla?

MR. PADILLA:  Judge, you have my sentencing memo and

I put in there, I think, reasons why a -- I'm not even going

to say a lower sentence than what Probation is saying.  My

argument simply is that I think that -- well, let me back up.

I understand this is a serious case.  Ms. Johnson

understands this is a serious case.  Ms. Johnson clearly

understands her prior record, absolutely.  She understands

that she is going to get, no matter what happens, whether the

numbers are closer to my numbers or whether the numbers are

closer to the Government's, she is going to jail for a long

time.  She will go to jail probably for at least three times

as much as she's ever been to jail before.  It is going to be

a long sentence, no matter what sentence you impose in this

case.

My argument simply is that I think that the Court

ought to follow the 3553 mandate, and that is, to fashion a

1  sentence that is sufficient but not greater than necessary to

2  punish Ms. Johnson.

3           Now, is it 120?  Is it 100?  You know, part of the

4  problem of coming to sentencings nowadays is the sentencing

5  has now been reduced to an addition problem, and we come out

6  with the numbers at the end, and that becomes the sentence,

7  and that becomes a recommendation from the Government.

8  Whether the numbers are 120 or 151 or 110, that becomes the

9  number.

10          And I think that the fact -- respectfully to

11  Mr. Anton, who has been very, very nice and decent to me in

12  this case and decent to Ms. Johnson -- you know, for them to

13  give us a number that is simply the number that's calculated

14  is not taking into account all the 3553 factors.

15          The Court's responsibility is to fashion a sentence

16  that's sufficient.  That's what's required.

17          What I provided this afternoon -- I apologize, it's

18  late, and Dr. Haber apologizes.  She's been bedridden for the

19  last week with a back injury.  So I apologize for that.

20          But I think that given her history -- and there's no

21  doubt that we can all, I think, appreciate her personal

22  history and the issue that she has.  And I think that when you

23  look at those things -- again, understanding her role,

24  understanding her prior history -- I think that the Court can

25  fashion a sentence much lower than that and still protect the

```
1   community, provide deterrence and all those things that the
2   Court must look at.  So my recommendation in my sentencing
3   memorandum was 77 to 96 months.
4          Now, I propose that, and now we have Demarcus Hough
5   being sentenced, who also had a very, very lengthy criminal
6   history, and he was sentenced to 77 months.
7          THE COURT:  He cooperated.
8          MR. PADILLA:  All right.  We also have Rufus Bethea,
9   who I know who doesn't also have the same criminal history as
10  Ms. Johnson, but who admittedly his role was, according to the
11  Government, the opposite -- or the equal to Ms. Johnson and he
12  was sentenced to 50 months.
13         THE COURT:  What was the loss amount?
14         MR. PADILLA:  I don't know.
15         Mr. Anton.
16         THE COURT:  Anyone else you want to cite while he
17  looks that up?
18         MR. PADILLA:  That's it, Judge.
19         MR. ANTON:  Judge, it was $49,000 for Rufus Bethea.
20  He was an offense level 19, category four.
21         THE COURT:  Huge difference.
22         MR. PADILLA:  She's being hit for that.  She's taking
23  the loss in the case.  So her numbers are gonna jump up.  I'm
24  not saying that she's gonna get a 50-month sentence.  That's
25  not what I'm saying.  What I'm saying is that is factored in
```

1   as one of the factors that you're considering in this case,

2   and she will be bumped up.  She will get a more lengthy

3   sentence than he did.

4          THE COURT:  Because she's responsible for $408,000 in

5   losses.

6          MR. PADILLA:  I understand.  I'm not asking for 50

7   months.

8          THE COURT:  Okay.

9          MR. PADILLA:  I'm not asking for 50 months.  I'm

10  asking for something that's sufficient.  And I think at some

11  point it becomes -- you know, I don't know what the difference

12  is between 10 years and 11 years and 12 and 20.  At some point

13  there has to be some sort of reasonableness to the sentence

14  that's imposed.  I understand this is a serious case.

15         THE COURT:  I could not agree more.

16         Does your client want to say anything?

17         MR. PADILLA:  Yes.

18         THE DEFENDANT:  I just want to say sorry for taking

19  your time and Mr. Marc Anton's time.  I did what I did.  I

20  told them when I got arrested what I did.  It's called a bank

21  and I know I played -- I thought I played a small role in this

22  case.  But it looks like it's bigger than what I thought it

23  was when I first got arrested.  And I just want to say sorry.

24         I know I need help 'cause I'm quick to let somebody

25  manipulate me to do something, and I know I'm gonna be

1  punished.  And I got kids that need me, and I won't see them

2  for many -- I just want to say sorry to the whole court and

3  the school teachers that was involved that I didn't even know,

4  but if they was here, I still tell them sorry for adding them

5  on, calling the bank and making their life that -- that's it.

6  Thank you.

7           THE COURT:  Okay.  Thanks, Ms. Johnson.

8           Well, I certainly would not dispute that this is a

9  sad case.  But Ms. Johnson's record is really deplorable.  She

10  has repeated theft and fraud type arrests.  Every time she's

11  been on any kind of supervision, she's violated, and even

12  after being punished for violating, she's violated time and

13  time and time again.  In fact, I daresay from looking at this

14  record that for at least ten years, and probably more, the

15  defendant has never not been in trouble with the law.

16           I just want to say something to Probation.  The blue

17  sheet reads that way.

18           THE PROBATION OFFICER:  Yes, Your Honor.

19           THE COURT:  Okay.  Fine.

20           So, as I've said before, with respect to other

21  defendants in this case, it's a serious case.  The nature of

22  the crime calls out for deterrence.  The nature of this

23  particular crime calls out for a significant sentence, and the

24  defendant has very little in her favor that would support a

25  variance.  So the Court is going to impose a guideline

1  sentence.

2          Now, I think, Mr. Anton, I need your sheet again,

3  unless it's still up here, with respect to the losses, because

4  at the time Probation prepared the presentence investigation

5  report, Probation did not have the benefit of your loss

6  calculation and the identity of the victims.

7          MR. ANTON:  May I approach, Your Honor?

8          THE COURT:  Yes.

9          And I think I need the language from Probation for --

10 do you have the restitution language handy, because it's also

11 not in the blue sheet.  Oh, it is.  I'm sorry.  Actually it is

12 in this one.

13         Okay.  So, if you and your client will stand,

14 Mr. Padilla, the Court is going to impose sentence at this

15 time.

16         And again, I'm going to say to the people in the

17 audience that if you cannot maintain appropriate behavior,

18 you're going to have to leave.

19         The Court has considered the statements of the

20 parties, the presentence report containing the advisory

21 guidelines and the statutory factors.  The Court believes a

22 guideline sentence is sufficient and not greater than

23 necessary to address the defendant's criminal conduct in this

24 case.

25         It is the finding of the Court that the defendant is

 1    not able to pay a fine as well as restitution.

 2         It is the judgment of the Court that the defendant,

 3    Brandi Johnson, is committed to the Bureau of Prisons to be

 4    imprisoned for 120 months.  This sentence consists of

 5    concurrent terms of 120 months as Count 1 and 60 months as to

 6    Count 2.

 7         It is further ordered that the defendant shall pay

 8    restitution in the amount of $408,082.18.

 9         During the period of incarceration payments shall be

10    made as follows:  If she earns wages in a Federal Prison

11    Industries UNICOR job, then the defendant must pay 50 percent

12    of wages earned toward the financial obligations imposed in

13    this judgment in a criminal case.  If she does not work in a

14    UNICOR job, then the defendant must may a minimum of $25 per

15    quarter toward the financial obligations imposed in this

16    order.

17         Upon release from incarceration the defendant shall

18    pay restitution at the rate of ten percent of monthly gross

19    earnings until such time as the Court may alter the payment

20    schedule in the interest of justice.  The United States Bureau

21    of Prisons, the U.S. Probation office, and the U.S. Attorney's

22    office shall monitor the payment of restitution and report to

23    the Court any material change in the defendant's ability to

24    pay.

25         These payments do not preclude the Government and

1   subsequently the United States Probation office from using any

2   other anticipated or unexpected financial gains, assets or

3   income of the defendant to satisfy the restitution

4   obligations.

5          The restitution shall be made payable to the Clerk of

6   the United States Courts and forwarded to the United States

7   Clerk's office, Attention:  Financial Section, 400 North Miami

8   Avenue, Room 8N09, Miami, Florida, 33128.

9          The restitution will be forwarded by the Clerk of the

10  Court to the following victims in the following amounts:

11  Wells Fargo/Wachovia, $34,705.79; Capital One, $110,559.94;

12  State Farm Bank, $59,231; American Express, $18,045; Citibank,

13  $34,721.60; Bank of America, $21,350; Sun Coast Schools Credit

14  Union, $112,043.15; and Navy Federal Credit Union, $17,425.70,

15  at the addresses that the Government will provide to the

16  probation office.

17         Upon release from imprisonment the defendant shall be

18  placed on supervised release for concurrent terms of five

19  years as to Count 1 and three years as to Count 2.

20         Within 72 hours of release from the custody of the

21  Bureau of Prisons the defendant shall report in person to the

22  probation office in the district to which the defendant is

23  released.

24         While on supervised release the defendant shall not

25  commit any crimes; she shall be prohibited from possessing a

1  firearm or other dangerous device; shall not possess a

2  controlled substance; shall cooperate in the collection of

3  DNA; and shall comply with the standard conditions of

4  supervised release, including the following special

5  conditions:  Mental health treatment, financial disclosure

6  requirement, self-employment restriction, related concern

7  restriction, permissible search, credit card restriction, and

8  restitution, as already ordered, and all as noted in Part G of

9  the presentence report.

10        The defendant shall immediately pay to the United

11  States an assessment of $100 as to each of Counts 1 and 2, for

12  a total of $200.

13        So the total sentence is 120 months imprisonment,

14  $408,082.18 in restitution, five years supervised release, and

15  a $200 assessment.

16        And now that sentence has been imposed, does the

17  defendant or her counsel object to the Court's findings of

18  fact or to the manner in which sentence was pronounced?

19        MR. PADILLA:  No, Judge.

20        THE COURT:  All right.  Ms. Johnson, you may have

21  some rights to take an appeal from the sentence I just

22  imposed.  If you want to take an appeal, the notice of appeal

23  has to be filed within 14 days of entry of the judgment of

24  conviction.

25        Also, if you want to take an appeal and you cannot

1  afford a lawyer to represent you on appeal or cannot afford

2  the costs of the appeal, the Court will waive the costs and

3  appoint a lawyer to represent you.

4          Any counts to be dismissed, Mr. Anton?

5          MR. ANTON:  No, Judge.

6          THE COURT:  Okay.  Thank you.  You're excused.

7      *     *     *     *     *     *     *     *     *     *

8                    C E R T I F I C A T E

9

10     I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  October 28, 2011                    /s/ William G. Romanishin

14

15

16

17

18

19

20

21

22

23

24

25